(No. 4939-

ROBERT N. McCORMICK, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed May 11, 1965.*

MELVIN O. MOEHLE, Attorney for Claimant.

WILLIAM G. CLARK, Attorney General; LAWRENCE W. REISCH, JR., Assistant Attorney General, for Respondent.

PEZMAN, J.

This is an action by claimant, Robert N. McCormick, against the State of Illinois, respondent, under the Structural Work Act for personal injuries sustained by claimant when he fell from a scaffold while working on a highway overpass in East Peoria, Illinois. On August 10, 1959, Robert N. McCormick, then approximately thirty-three years of age, was employed as a laborer by The McDougal Hartmann Co. of Peoria, Illinois. Claimant and another workman were working on a scaffold underneath a highway overpass, which was known as Industrial Spur No. 10 in East Peoria, Illinois. Both men were working on the scaffold some twenty-five to thirty feet above the ground. The scaffold was suspended from the overpass by means of dollies riding on steel rails, which were suspended by cables attached to the bannisters on the overpass. The dolly wheels rode on the small I-beams at each end of the scaffold, and the scaffold moved in two directions, both the width and the length of the bridge. The rails upon which the dolly wheels rode were twenty to thirty feet long and in sections, which were apparently moved as the work progressed. Claimant and his fellow workman had transferred one end of the scaffold to a new rail, and, as Mr. McCormick was walking across the scaffold to the opposite end to assist in moving it to the next rail, one end of the scaffold came off of the I-beam, and dropped down. This movement threw claimant off of the scaffold to the ground some twenty-five or thirty feet below, and he sustained serious and permanent injuries.

Claimant contends that the State of Illinois, as respondent, was the owner of the premises, and was guilty of a

wilful violation of the Structural Work Act, and that, therefore, claimant is entitled to an award in the sum of $25,-000.00. Claimant seeks to establish such responsibility under the Structural Work Act. He alleges and seeks to prove that respondent had charge of the work at the time of the accident, and was guilty of a wilful violation of the act or wilful failure to comply with any of its provisions.

Respondent contends that the State must be found to have been "in charge of" the work at the time of the accident, and argues that evidence introduced by the State tends to show that the State was not in charge of or responsible for safety control, but admittedly had control of the quality of the work and the materials used. Respondent further contends that, although the contract for the construction gave the State specific control, such control is limited to quality and not safety. Respondent claims that, in the event an award is made to claimant, it should be allowed to off-set the amount of Workmen's Compensation coverage from the award granted.

Claimant's own testimony and exhibits Nos. 3 and 4 clearly indicate that the scaffold in use at the time of the accident traveled on dolly wheels suspended from I-beams, and that it was necessary that these wheels be transferred to adjacent I-beams when they reached the end of a section of such beam. The accident in question occurred when claimant and the other man on the scaffold were moving the scaffold ahead at the end of such a section of I-beam. From such testimony it appears that the dolly wheels on one corner of the scaffold lost contact with the I-beam, which caused claimant to lose his balance and fall to the ground from a heighth of about twenty-five to thirty feet.

The evidence clearly establishes that the scaffold in question had a ten inch high piece of tubing or railing on each side to keep material from dropping off of the scaffold,

with no protection on the ends. It further discloses that the scaffold had no safety hooks or safety cables attached to its structure, and that the scaffolding was about 8 feet wide and about 20 feet long and made of steel tubing. The scaffolding did not fall, but was hanging with one corner down immediately after the accident. The testimony establishes that the scaffold in use from which claimant fell was hung in a different manner than were othere scaffolds used on the same job. The I-beam to which the scaffold was attached by dolly rails was hung from the top rail of the bridge structure by steel cables, which swayed with the wind or upon movement by the parties using the scaffold.

Claimant called, as an adverse witness under Section 60 of the Civil Practice Act, A. F. Burnham, District Construction Engineer for District 4 of the Division of Highways at Peoria. Mr. Burnham testified that all plans and specifications of the structure were prepared by the Division of Highways; that engineers and technicians under his supervision did the staking work for the bridge, and that the contract was let on March 25, 1958, and awarded on April 3, 1958 to the McDougal Hartmann Company of Peoria. Burnham stated that he was on the job weekly throughout the entire construction period, and that he had representatives or employees under his jurisdiction on the job at the same time. He testified that Henry C. Bankie, Jr. was under his supervision on this particular job, and was the Project Engineer, and had a number of men working under him. He stated that his job was to inspect the work of the engineers under him, and that Bankie was required to report the progress to him weekly, and had an office approximately 1¼ miles from the construction site.

Burnham stated that the word "engineer," as used in the specifications for road and bridge construction of the State of Illinois, refers to the Chief Highway Engineer and his

delegated authority. He stated that he was a part of the delegated authority of said Chief Highway Engineer, as was Mr. Bankie on the date of August 10, 1959. He also testified that Article 5.1, of the Standard Specifications For Road And Bridge Construction, entitled "Authority of Engineer," adopted January 2, 1952, applied to the contract for construction of the overpass on which the accident happened. Burnham further testified that Article 5.11 entitled "Inspection" applied to the contract in question in this cause, as well as Article 8.8, entitled "Suspension of Work," and Article 8.7, entitled "Character of Workmen and Equipment." Burnham stated that he had noticed the scaffolding on the bridge construction in question some weeks after they had finished the pouring of the deck. He said he saw the men working on the scaffolding and that the appearance of the scaffolding was the same as that shown in claimant's exhibits Nos. 1, 2, and 3 with the exception that the scaffolding in use at the time of the accident was not secured by the hook fastened to the lower plank of the I-beam on each end, as is shown in the exhibits. Burnham stated that he did not observe any handrails on the scaffolding itself, and further testified that the suspension of the railing on which the scaffolding ran was suspended to a cable attached to the handrail attached to the structure above, which would allow the scaffold to sway.

Henry C. Bankie, Jr. was called as an adverse witness under Section 60 of the Civil Practice Act, and testified that he was an engineer with the Division of Highways, State of Illinois; that on August 10, 1959, he was Project Engineer under the immediate supervision of A. F. Burnham, Construction Engineer, on Contract No. 13529 for the building of an overpass on Route No. 10 Spur at East Peoria, Illinois. He testified that he was the Project Engineer on the overpass bridge in question during its entire period of con-

struction, and visited the construction site approximately daily. He stated that he had free access to see and inspect any part of the premises, and frequently spent from fifteen minutes up to two hours each day at the site of the overpass bridge upon which the accident occurred. He testified that he was not at the site on August 10, 1959, but did know that an accident occurred on that date. His testimony included statements verifying claimant's exhibits as to the type of scaffolding that was being used on August 10, 1959 when the accident occurred. He stated that the scaffolding did not have any side or end rails, and was suspended from the structure above it in such a manner that it would sway. He testified that the scaffolding was supported by dollies, which ran on I-beams attached to the cables hung from the top side of the bridge, and that there was nothing to prevent the scaffold from falling if the dollies came off of the rails.

Respondent called as a witness, Jack C. Tomlinson, Superintendent for McDougal Hartmann Company on the project in question in this cause of action. He testified that he was a graduate engineer, had been in the construction business for ten years, and had never seen safety nets used under the type of scaffold in use when the accident occurred. He stated that he was not on the job at the time of the accident, but arrived at the scene afterwards, and saw the scaffolding from which claimant fell. He testified that one corner of the scaffold was down about six feet from the rail, but the other three corners were connected to the rails from which the scaffolding was suspended. He stated that apparently the trolley came through the joints, between the two rails. He also indicated that there were no handrails on the scaffold. Tomlinson admitted upon cross-examination that the scaffolding did not have safety rails properly bolted, secured, and braced rising at least thirty-four inches

above the floor, extending along the entire length of the outside of the ends of the scaffolding. He stated that, in fact, the scaffolding did not have any safety rails at all, and was not fastened to the structure, so as to prevent it from swaying. Mr. Tomlinson testified that he saw Mr. Bankie and Mr. Burnham at the project site, prior to August 10, 1959, and that he conferred with both of them regarding the construction of the highway overpass bridge, and that they both gave him instructions as to the nature of the project, and particularly as to quality control. He stated that in his supervisory position he followed the instructions given by Mr. Burnham and Mr. Bankie.

Respondent called as a witness, Robert A. Duncanson, a graduate civil engineer, who had been in the construction business for fifteen years, and who testified that he had worked on sixty bridges during the past five years, and was very familiar with scaffolding being used in the business. He stated that from hearing the testimony in the case, observing the exhibits and that the scaffolding, as shown in the exhibits, was the usual and customary type of scaffolding used in this type of work. He also stated that it was not the custom and usage generally to use safety belts or safety hooks on this type of scaffolding.

Respondent called for direct testimony, A. F. Burnham, and among other things Mr. Burnham stated that his Project Engineer, Mr. Bankie, had no responsibilities regarding safety for the type of work being done. He also testified that it was not customary to use handrails upon scaffolds in this type of operation. Upon cross-examination by claimant's counsel, Mr. Burnham testified as follows: "There is no—according to my interpretation of the Standard Specifications, there are no provisions for the engineer to instruct the safety of the work." Upon further questioning, he indicated that it was his interpretation of the Standard Specifi-

cations that there was no responsibility on the part of his men or himself to make safety inspections.

Counsel for parties hereto stipulated and agreed as to the following facts:

1. That at the time of the occurrence herein, on August 10, 1959, the State of Illinois was the owner of a certain structure, known as a highway bridge, located over Route U.S. No. 150, Toledo, Peoria and Western Railroad tracks, and had an easement over the railroad tracks and Farm Creek.

2. That, on August 10, 1959, respondent, State of Illinois, was constructing a new highway bridge on the said premises, and had as one of its contractors on said job The McDougal Hartmann Co.

3. That at said time and place the scaffold on which claimant was working had been constructed by employees of the McDougal Hartmann Company other than himself.

4. That notice of intention to commence suit in the Court of Claims was given to Grenville Beardsley, Attorney General of the State of Illinois, on or about February 1, 1960, and, further, that notice of intention to commence suit in the Court of Claims was given to Charles F. Carpentier, Secretary of State and Ex Officio Clerk of the Court of Claims, on or about February 1, 1960.

5. That no assignment or transfer of the claim, or any part thereof, or interest therein, has been made to any person or persons.

In the case at hand, respondent is charged with wilful violation of Section 60, Chap. 46, Ill. Rev. Stats., which provides as follows:

"Scaffolds, cranes, ladders, etc. — Erection and construction.

". . . That all scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or

corporation in this State for use in the erection, repairing, alteration, removal, or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon.

"Scaffold, or staging, swung or suspended from an overhead support more than twenty (20) feet from the ground or floor shall have, where practicable, a safety rail properly bolted, secured and braced, rising a (at) least thirty-four (34) inches above the floor or main portion of such scaffolding or staging, and extending along the entire length of the outside and ends thereof, and properly attached thereto, and such scaffolding or staging shall be so fastened as to prevent the same from swaying from the building or structure."

Claimant seeks to recover under Section 69 of the same Act, and is attempting to prove that respondent was guilty of wilful violation of the Act, or wilful failure to comply with any of its provisions. Ownership of the premises has been established by the stipulation entered into between claimant and respondent. In order to make an award, this Court must find that respondent not only wilfully violated or wilfully failed to comply with the provisions of the Act, but also was in control or had charge of the work being performed. *Gannon* vs. *Chicago, Milwaukee, St. Paul and Pacific Railway Co.*, 22 Ill. (2d) 305. Prior to the language of the Supreme Court in the Gannon case, the words "having charge of" were of no legal consequence in determining the liability of the owner of any building or other structure under the Act. In the Gannon case, the Court held that the statute did not intend liability where there was no control, stating:

"The Act specifies, 'Any owner, contractor, subcontractor, foreman, or other person *having charge of* (emphasis supplied) the erection, construction, repairing, alteration, removal, or painting of any building, bridge, viaduct or other structure within the provisions of the Act, shall comply with all the terms thereof. . . .'. It is inescapable from these words that the Legislature intended to hold liable those named persons who are in charge of the work, and the words 'or other person' were included to cover the

situation where someone other than the named persons was in charge of the work, in order to prevent such person from escaping liability."

The Supreme Court also noted that Section 9 of the Act imposes civil liability only for "willful violations," which means knowing violations, and that these can only be perpetrated by persons directly connected with the operations, and not by virtue of mere ownership of the premises.

Respondent's exhibits Nos. 5, 6, and 6a were admitted in evidence. Exhibit No. 5 is identified as contract No. 13529. It contains The Notice to Bidders, Specifications, Proposal, Contract, and Contract Bond. Exhibits Nos. 6 and 6a are identified as being The Standard Specifications For Road And Bridge Construction and Supplemental Specifications. The State of Illinois awarded contract No. 13529 for the construction of the highway overpass in question to McDougal Hartmann Company of Peoria, Illinois on April 3, 1958. Article 5.1 of the Standard Specifications For Road And Bridge Construction, which is entitled "Authority of Engineer," reads as follows:

"All work shall be done under the supervision of the Engineer, and to his satisfaction. He shall decide all questions which arise as to the quality and acceptability of material furnished, work performed, manner of performance, rate of progress of the work, interpretation of the plans and specifications, acceptable fulfillment of the contract, compensation and disputes, and mutual rights between contractors under the specifications. He shall determine the amount and quality of work performed and materials furnished, and his decision and estimate shall be final. His estimate shall be a condition precedent to the right of the contractor to receive money due him under the contract. In case of failure on the part of the contractor to execute work ordered by the Engineer, the Engineer may, at the expiration of a period of forty-eight (48) hours after giving notice in writing to the contractor, proceed to execute such work as may be deemed necessary, and the cost thereof shall be deducted from compensation due or which may become due the contractor under the contract."

Article 5.11, entitled, "Inspection," reads as follows:

"All materials and each part of detail of the work shall be subject at all times to inspection by the Engineer or his authorized representatives, and the contractor will be held strictly to the true intent of the specifications in regard to quality of materials, workmanship, and the diligent

execution of the contract. Such inspection may include mill, plant, or shop inspection, and any material furnished under the specifications is subject to such inspection. The engineer or his representatives shall be allowed access to all parts of the work, and shall be furnished with such information and assistance by the contractor as is required to make a complete and detailed inspection."

Article 8.7, entitled, "Character of Workmen and Equipment," reads as follows:

"The contractor shall employ only competent and efficient laborers, mechanics, or artisans, and whenever, in the opinion of the engineers, any employee is careless, incompetent, obstructs the progress of the work, acts contrary to instructions or conducts himself improperly, the contractor shall, upon request of the engineer, discharge or otherwise remove him from the work and shall not employ him again, except with the written consent of the engineer."

Article 8.8, entitled, "Suspension of Work" reads as follows:

"The engineer shall have authority to suspend the work wholly or in part, for such period of time as he may deem necessary, due to conditions unfavorable for the satisfactory prosecution of the work, or to conditions which in his opinion warrant such action; or for such time as is necessary by reason of failure on the part of the contractor to carry out orders given; or to perform any or all provisions of the contract. No additional compensation will be paid the contractor because of any costs caused by such suspension, except when the suspension is ordered for reasons not resulting from any act or omission on the part of the contractor, and not related to weather conditions. If it becomes necessary to stop work for an indefinite period of time, the contractor shall store all materials in such manner that they will not obstruct or impede the traveling public unnecessarily or become damaged in any way, take every precaution to prevent damage or deterioration of the work performed, provide suitable drainage of the roadway, and erect temporary structures where necessary. The contractor shall not suspend work without written auhority from the Engineer."

These Articles from the Standard Specifications are incorporated in the contract by reference, and are an essential part thereof. They indicate without doubt the imposition of authority upon the Engineer (Chief Highway Engineer and those Engineers delegated thereunder) to control and take charge of the project on behalf of respondent. The Construction Engineer, Mr. Burnham, and the Project Engineer, Mr. Bankie, were admittedly in charge of the project involved herein, discussed the same with the Superintendent

on behalf of the contractor, and gave orders to the Superintendent, which he followed. The testimony of Messrs. Burnham and Bankie that they were not responsible for the safety of the workmen and were only concerned with quality control is overtly contrary to the language of the contract and the Standard Specifications, and against the best interest of the public and the State of Illinois. Absence of proper safety precaution and inspection would add to the cost of the project, as well as obstruct the progress of the same. This Court does not deny that the major interest of the Department of Public Works and Buildings in supervising construction is to control the quality under the contract, but it will not accept the premise that the Department assumes no responsibility for safety in its supervision of the same projects. It is the opinion of this Court that the State of Illinois, through its Division of Highways and Chief Highway Engineer, and any delegated authority thereunder, did assume control of and take charge of the particular project involved in this case. Both the Construction Engineer, A. F. Burnham, and the Project Engineer, Henry C. Bankie, Jr., testified to knowing in advance of August 10, 1959, when the accident happened, that the scaffold in question had neither safety rails, nor was so attached that it would not sway, as provided for in Section 60 of Chap. 48, Ill. Rev. Stats.

Irregardless of the customary usage in the construction trade in the Peoria area, the Structural Work Act proposed a duty that such scaffold "suspended from an overhead support more than twenty (20) feet from the ground or floor shall have, where practicable, a safety rail properly bolted, secured and braced, rising at least thirty-four (34) inches above the floor or main portion of such scaffolding or staging, and extending along the entire length of the outside and ends thereof, and properly attached thereto, and such scaffolding or staging shall be so fastened as to prevent the same

from swaying from the building or structure." We find that respondent was not only guilty of a "knowing violation" of the Structural Work Act, but also had charge of the structural activities in and about the project.

Respondent seeks to set off any Workmen's Compensation award against any award made herein to claimant, and argues that the Court of Claims has heretofore taken into consideration amounts, which have been paid to a claimant under a covenant not to sue, and has also allowed a set-off of amounts paid by a joint wrongdoer as against an award made to claimant. The case at hand does not involve joint tort feasors.

In the Workmen's Compensation claim, claimant, Robert N. McCormick, was the petitioner, and McDougal Hartmann Co. was the respondent. The relief afforded was statutory, and did not arise as a right out of the commission of a tort. In the case at hand, claimant seeks to recover from respondent, the State of Illinois, in the Court of Claims under another statute, the Structural Work Act. We find no analogy in these two situations. The Appellate Court in the case of *Anna L. Bryntensen* vs. *Carroll Construction Company,* 36 Ill. App. 2d 167, and affirmed in 27 Ill. 2d 566 at 568, held that evidence of the receipt of Workmen's Compensation payments was properly excluded from the jury. In the Bryntensen case, a widow who had received Workmen's Compensation payments from her deceased husband's employer, a subcontractor, for loss of support, sued the general contractor also for loss of support, alleging wilful violation of the Structural Work Act. The Court cited the O'Brien case (*O'Brien* vs. *Chicago City Railway Co.,* 305 Ill. 244), where the Supreme Court said: "No injustice is done to a person negligently injuring another in requiring him to pay the full amount of damages for which he is legally liable without deduction for compensation which

the injured person may receive from another source, which has no connection with the negligence, whether that source is a claim for compensation against his employer, a policy of insurance against accidents, a life insurance policy, a benefit from a fraternal organization, or a gift from a friend."

From the testimony of claimant and medical witnesses, it is apparent that the injuries to claimant were extensive. The accident occurred on August 10, 1959, and he was hospitalized from that date until September 14, 1959 at St. Francis Hospital, Peoria, Illinois, from whence he was transferred successively to the Forest Park Rehabilitation Center and Massachusetts Memorial Hospital in Boston, Massachusetts. On October 11, 1960, he was discharged from the Massachusetts Memorial Hospital and took up residence at 617 East Virginia Avenue in Peoria, Illinois. Claimant was again hospitalized on December 4, 1960 for a bladder operation, and again on June 7, 1961. He was subsequently discharged on December 13, 1961. From the evidence, it is apparent that, as a result of the accident on August 10, 1959, claimant was paralyzed from the chest down. His right elbow and wrist were shattered, and he lost the rotation in the right wrist. There are a few degrees of movement in the elbow. He has no movement in his legs, and cannot stand or walk. He uses crutches or a wheelchair. He does not have any bladder control, and urine elimination is by permanent catheter. Claimant also has no control of his bowel movements. At the time of the hearing he was not employed, and had not been employed since the date of the accident. He requires daily assistance, which his mother was performing, although he had had a male attendant in the past. Through the use of hand controls, claimant is able to get in and out of his car. It is apparent that he has lost his ability to work and care for himself or his family.

Claimant is awarded the sum of $25,000.00.